998 So.2d 597 (2008)
Willie H. NOWELL, Appellant,
v.
STATE of Florida, Appellee.
No. SC06-276.
Supreme Court of Florida.
December 30, 2008.
*599 Robert R. Berry and Gregory W. Eisenmenger of Eisenmenger, Berry and Peters, P.A., Viera, Florida, for Appellant.
Bill McCollum, Attorney General, Tallahassee, Florida, and Charmaine M. Millsaps and Barbara C. Davis, Assistant Attorneys General, Daytona Beach, Florida, for Appellee.
PER CURIAM.
This case is before the Court on appeal from a judgment of conviction for first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons explained below, we reverse and remand for a new trial.

Facts and Procedural History
Kelvis Smith and Michelle Gill were a couple for almost eight years. Gill was pregnant with Smith's child. On June 14, 2002, Smith picked Gill up from work and they went straight home. After arriving home, Gill went into the house first. When Smith entered the house he saw two men, and he saw that the bedrooms had been ransacked. Gill was sitting on the floor crying while one of the men had a gun pointed at her. Nowell pulled a gun on Smith. The two intruders were not wearing masks and Smith recognized them as Willie Nowell and Jermaine Bellamy. Smith asked Nowell what was going on, and Nowell said he believed that Smith had previously shot him. Smith denied having shot Nowell.[1]
Nowell and Bellamy discussed what they should do. Nowell stated, "If we let them go, they going to try to kill us." Bellamy then made a slicing motion across his throat. While acting hysterical, Gill begged Nowell not to do anything to Smith. She stated if they did not, she would not call the police after they left. Nowell and Bellamy forced Smith and Gill to sit in the closet in the back room. Smith testified that he thought that the two men were getting ready to leave but then he saw both the guns come across from the side of the closet and bullets coming down the wall.
After the "flurry of bullets," Smith looked at Gill. She was shaking but did not say anything. Soon thereafter Smith lost consciousness. When Smith regained consciousness, he was tied up and sitting in the darkness of the closet. Gill was beside him, not moving. She was fatally injured with multiple gunshot wounds. Smith was shot near his right eye and in his jaw. The paramedics transported Smith to a medical center.
On June 17, 2002, two officers and a detective from the Palm Bay Police Department interviewed Smith at the medical center. Smith used sign language to tell them Nowell and Bellamy were the shooters.[2] Smith identified Nowell and Bellamy through two photo lineups. Smith knew Nowell because Nowell was a friend of Smith's older brother, and Smith and Nowell had worked at the same steakhouse.
On July 16, 2002, Willie H. Nowell and Jermaine Bellamy were charged by indictment with the following crimes: (1) first-degree premeditated murder; (2) attempted first-degree premeditated murder; (3) killing of an unborn child by injury to the *600 mother; (4) armed burglary of a structure while inflicting great bodily harm or death; (5) robbery with a firearm while inflicting great bodily harm or death; (6) kidnapping while inflicting great bodily harm or death; (7) another count of kidnapping while inflicting great bodily harm or death; (8) grand theft of a motor vehicle; (9) possession of firearm by convicted felon (Bellamy); and (10) possession of firearm by convicted felon (Nowell). Bellamy's trial was severed from Nowell's trial. Count ten was dismissed when Nowell later pled to other pending charges and to violations of probation. The jury trial commenced on September 29, 2005, in the circuit court in Brevard County. The jury returned guilty verdicts on all of the charges, and trial court adjudicated Nowell guilty of each count.
During the State's penalty phase closing argument, the prosecutor made comments that Nowell argues were improper. Nowell objected to the comments and moved for a penalty phase mistrial after each objection. The trial court overruled the objections and denied the motions for mistrial. The jury issued an advisory sentence that recommended the death penalty for Nowell by a vote of seven to five. A Spencer[3] hearing was held on December 12, 2005.
On January 31, 2006, the trial court issued its judgment and sentence. The trial court found four aggravating circumstances applicable to Gill's murder: (1) Nowell had been convicted of a felony involving the use or threat of violence to the person; (2) the crime for which Nowell was to be sentenced was committed while he was engaged in the commission of or an attempt to commit the crimes of attempted first-degree murder, robbery, and kidnapping; (3) the crime for which Nowell was to be sentenced was committed for the purpose of avoiding or preventing a lawful arrest; and (4) the crime for which Nowell was to be sentenced was a homicide and was committed in a cold, calculated, and premeditated (CCP) manner without any pretense of moral or legal justification.
The trial court found four statutory mitigating circumstances: (1) the crime for which Nowell was to be sentenced was committed while he was under the influence of extreme mental or emotional disturbance; (2) the capacity of Nowell to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; (3) the age of Nowell at the time of the crime; and (4) the existence of any other factors in Nowell's background that would mitigate against imposition of the death penalty. The trial court also found the following nonstatutory mitigating circumstances: (1) Nowell voluntarily surrendered to authorities; (2) Nowell was a good son and friend; (3) Nowell was removed at an early age from his mother and raised in a foster home, grew up without his father, was raised by his mother and stepfather, and was the victim of neglect as a child; (4) Nowell suffered a traumatic incident as a victim of an assault and had been sexually abused; (5) Nowell was a good employee; (6) Nowell received no psychological or psychiatric treatment; (7) Nowell handled himself acceptably and appropriately at trial; (8) Nowell will adjust well to prison life; (9) Nowell exhibited good behavior in jail prior to and after the verdict; (10) Nowell was involved in religious activities at a young age; (11) Nowell has family and friends who care for and love him; (12) Nowell may have been exposed to negative influences in his life; and (13) society can be protected by a sentence of life imprisonment.
*601 In evaluating the aggravating and mitigating circumstances, the trial court found that the aggravating circumstances clearly outweighed the mitigating circumstances. The court sentenced Nowell to death for the murder of Michelle Gill; life imprisonment for attempted first-degree premeditated murder; fifteen years for the killing of an unborn child by injury to the mother; life imprisonment for the armed burglary of a structure while inflicting great bodily harm or death; life imprisonment for robbery with a firearm while inflicting great bodily harm or death; life imprisonment for each count of kidnapping while inflicting great bodily harm or death; and five years for grand theft of a motor vehicle. All sentences are to be consecutive.
In his appeal to this Court, Nowell raises five claims of error.[4] We only address two of the claims: that the trial court erred in allowing the State's peremptory strike of Nelson Ortega, a member of a minority group, and that the trial court erred in denying appellant's objections and motions for mistrial made during the State's penalty phase closing argument. We will not address the other claims because they are rendered moot as a result of our decision. Because we find that the trial court erred in its rulings on these claims, we vacate the judgments and sentences imposed and remand for a new trial.

Peremptory Strike of Prospective Juror
Nowell contends that the trial court erred in allowing the State's use of a peremptory challenge against Mr. Ortega, a potential juror who was described as being of Hispanic descent, because the State's race-neutral reason for the strike was not genuine. The State argues that the trial court properly allowed it to use a peremptory challenge against Mr. Ortega because the prosecutor offered facially race-neutral reasons, namely, that the potential juror was of a similar age to the defendant and that his philosophies on the death penalty might prevent him from following the law, and that the trial court's decision should be affirmed because it was not clearly erroneous.
It is well settled in Florida that peremptory challenges may not be used to exclude prospective jurors solely because of their race or ethnicity. See State v. Alen, 616 So.2d 452 (Fla.1993); State v. Neil, 457 So.2d 481 (Fla.1984), receded from on other grounds by State v. Johans, 613 So.2d 1319 (Fla.1993). An individual venireperson has the constitutional right not to be excluded from jury service on the basis of race. See Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). Potential jurors also have an equal protection right under both the state and federal constitutions "to jury selection procedures free from stereotypical presumptions that reflect and reinforce patterns of historical discrimination." Rivera v. State, 670 So.2d 1163, 1165 (Fla. 4th DCA 1996) (citing J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 129, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994)), receded from on other grounds *602 by Foster v. State, 767 So.2d 525 (Fla. 4th DCA 2000).[5]
In Melbourne v. State, 679 So.2d 759, 764 (Fla.1996), we clarified the guidelines that are to be used whenever a race-based objection to a peremptory challenge is made. We stated:
A party objecting to the other side's use of a peremptory challenge on racial grounds must: a) make a timely objection on that basis, b) show that the venireperson is a member of a distinct racial group, and c) request that the court ask the striking party its reason for the strike. If these initial requirements are met (step 1), the court must ask the proponent of the strike to explain the reason for the strike.
At this point, the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). If the explanation is facially race-neutral and the court believes that, given all the circumstances surrounding the strike, the explanation is not a pretext, the strike will be sustained (step 3). The court's focus in step 3 is not on the reasonableness of the explanation but rather its genuineness.
Id. (footnotes omitted). In determining whether a reason is genuine, the relevant circumstances to be considered may include, but are not limited to, the following: "the racial make-up of the venire; prior strikes exercised against the same racial group; a strike based on a reason equally applicable to an unchallenged juror; or singling the juror out for special treatment." Id. n. 8.
We acknowledge that peremptory challenges are presumed to be exercised in a nondiscriminatory manner and that the appropriate standard of appellate review for determining the threshold question of whether there is a likelihood of racial discrimination in the use of peremptory challenges is abuse of discretion. Hoskins v. State, 965 So.2d 1, 7 (Fla.2007) (quoting Jones v. State, 923 So.2d 486, 490 (Fla.2006)), cert. denied, ___ U.S. ____, 128 S.Ct. 1112, 169 L.Ed.2d 827 (2008); accord Files v. State, 613 So.2d 1301, 1304 (Fla. 1992). Generally, the trial court is in the best position to assess the genuineness of the reason advanced, and the decision will be affirmed unless clearly erroneous. See Jones, 923 So.2d at 490. However, this Court has also confirmed that "deference does not imply abandonment or abdication of judicial review," Dorsey v. State, 868 So.2d 1192, 1200 (Fla.2003) (quoting Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003)), because "[d]eference does not by definition preclude relief." Miller-El, 537 U.S. at 340, 123 S.Ct. 1029. As we will now explain, we conclude that the State's race-neutral reasons were clearly pretextual and not genuine and that the trial court therefore committed reversible error in allowing the State to exercise a peremptory challenge against Mr. Ortega.
Following voir dire of the prospective jurors, the State sought to exercise a peremptory challenge for Mr. Ortega. Mr. Ortega was described as a person of Hispanic background. The defense objected to the peremptory challenge and asked for a Neil inquiry. The court asked the prosecutor, John Parker, his reasons for the challenge. The prosecutor said:

*603 My reasons are two-fold. Number one, as I look at it, he appears young and of a similar age to the defendant. I would think that Mr. Ortega would relate to the defendant based on age.
Second of all, I noted that his wife works for Devereux, which is a childcare nurturing facility.
I am concerned, based on philosophies within the family, that he may not be able to follow the law when it comes to the actual, in any phase of this particular proceeding.
The judge did not recall any specific answers that would raise that concern about following the law and asked the prosecutor what specific answers by Mr. Ortega would justify such a concern. The prosecutor responded:

There [are] no specific answers. But following the law, I would argue, is what we use to determine whether or not a cause challenge is granted, whether or not that person can follow the law.

My race-neutral reason is, in spite of the fact that he said he could follow the law, I don't particularly like him, I don't think he is going to be the kind of juror that I would like. And for those reasons which were race-neutral, I'm asking the Court to proceed with allowing me my peremptory challenge.
(Emphases added.)
Defense counsel argued that the prosecutor's reasons were not race-neutral:
Mr. Ortega has a sister who is in law enforcement. That would normally be something that the State of Floridaor involved in law enforcement, that would normally be a characteristic that would be somewhat more state-oriented.
He's a hard-working individual, he works in retail at a 7-Eleven, he said he would follow the law, even if he didn't like it. There is nothing that I heard that would indicate he wouldn't support the State's position.
Our only suggestion is that he happens to be a person of color, so we object to the State's grounds.
In response, the prosecutor made the following remark:
And this is why, because we have peremptoral challenges, the problem I have with it is, in the past it's not like somebody's face. The problem is, well, listen, you can't strike anybody from now on because of race. All minorities have a right to sit, they have a right to sit, can't strike them because of race.

My reason for striking him is that he's young and appears to be the same or similar age as the defendant, that's my first reason. I think that's sufficient for a peremptory challenge, whether or not it goes for cause for his inability to actually follow the law.
I think he would associate himself with the defendant because of his age. I think he looks at the defendant and says, you know, that could be me. As a result, it's going to be more difficult for him, if not impossible, to actually do what's asked of him in terms of following the law.
For that primary reason that I'm asking that he be stricken, that peremptory challenge, I don't want to confuse it with a cause challenge unless the Court finds that my race-neutral reason is not reasonable. Certainly, that's within the discretion of the Court.
(Emphasis added.)
After a discussion about Florida caselaw, the trial court asked whether there were other white males of similar age to Mr. Ortega that were not stricken and the parties agreed that David Collins, an individual who actually sat on the jury in this case, was one such juror. The court then, *604 without explaining its reasoning, found that the State's race-neutral reasons were reasonable and allowed the strike to remain. The following day, the trial court allowed additional argument from each side on this issue and again, without expressing its reasoning, found the reasons to be genuine and sustained the peremptory challenge.
In order to determine whether the trial court's decision to allow this peremptory strike was clearly erroneous, we must review the alleged race-neutral reasons given by the State and the circumstances in which they were made. See, e.g., Melbourne, 679 So.2d at 764. A review of the record indicates that the State offered three separate reasons for striking Mr. Ortega: (1) that the prosecutor did not "particularly like" Mr. Ortega; (2) that Mr. Ortega was of a similar age to the defendant and would therefore relate to him; and (3) that because of Mr. Ortega's wife's job at a child daycare center, he would not be able to put aside his personal philosophies and follow the law. We address each reason in turn.
First, the prosecutor justified his use of a peremptory challenge because he did not "particularly like" Mr. Ortega and did not "think he [was] going to be the kind of juror that [he] would like." However, Florida courts have consistently rejected a general feeling or "dislike" of a juror as a genuine race-neutral reason for exercising a peremptory challenge. See State v. Holiday, 682 So.2d 1092, 1094 & n. 1 (Fla. 1996) (affirming the trial court's refusal to allow a peremptory strike based on the defense counsel's "gut feeling" that the potential juror would favor the State); Foster v. State, 557 So.2d 634, 635 (Fla. 3d DCA 1990) ("[A] `feeling' about a juror does not satisfy the Neil test."). This is especially so when the proponent of the strike points to nothing in the record, such as worrisome behavior or questionable answers given by the potential juror during voir dire, which supports a general distaste for a particular juror. Id.; see also Dorsey, 868 So.2d at 1201-02 (emphasizing the need for record support for the race-neutral reason proffered for a peremptory challenge); State v. Slappy, 522 So.2d 18, 24 (Fla.1988), receded from in part on other grounds by Melbourne v. State, 679 So.2d 759 (Fla.1996) (noting that deference to the trial court's findings is diminished where the State fails to demonstrate that the alleged reason for the peremptory challenge actually existed).
Secondly, the prosecutor wanted to challenge Mr. Ortega because of his age, stating that "he appears young and of a similar age to the defendant. I would think that Mr. Ortega would relate to the defendant based on age." Although this Court has never held that age is a legitimate race-neutral reason for a peremptory challenge, district courts have concluded that it is. See Saffold v. State, 911 So.2d 255, 256 (Fla. 3d DCA 2005) (holding that peremptory challenge based on age of juror is permissible); Daniels v. State, 837 So.2d 1008 (Fla. 3d DCA 2002) (same); Cobb v. State, 825 So.2d 1080 (Fla. 4th DCA 2002) (concluding that it was not unreasonable to strike a prospective juror in a drug case when the State genuinely believed that the juror's youth and status as a student would cause her to be more lenient). However, the court's inquiry does not end when the proponent of the strike points to the potential juror's age; rather, the judge must consider all the relevant circumstances to determine whether the justification is genuine, including the reasonableness of the explanation and whether other jurors of a similar age were challenged for these reasons. See Hoskins, 965 So.2d at 9; Booker v. State, 773 So.2d 1079, 1089-90 (Fla.2000) (acknowledging *605 that a race-neutral reason that applied to another juror who was not challenged could indicate pretext); Melbourne, 679 So.2d at 764 & nn. 8-9. In this case, Mr. Ortega was struck from the jury panel based on his young age, which was a reason equally applicable to a white juror who was not challenged by the State.
During the trial, the defense and the State agreed that Mr. Collins was both white and the only remaining member of the jury who was young. According to defense counsel, Mr. Collins appeared to be younger than Mr. Ortega, and during voir dire, Mr. Collins confirmed that he worked as a web designer for a corporation and had one son who lived separately with the mother. Similarly, Mr. Ortega was identified as being in his mid-to late twenties, worked in retail at a 7-Eleven, was married and had three children. The record confirms that both of these potential jurors were around the same age, were fathers, and were neither asked questions nor gave any responses during voir dire indicating they would identify with the defendant. Therefore, the State's age-based justification for striking Mr. Ortega, a Hispanic male, was clearly applicable to Mr. Collins, a similarly aged white male whom the State failed to challenge. See Booker, 773 So.2d at 1089-90; Davis v. State, 691 So.2d 1180 (Fla. 3d DCA 1997) (holding that pretext may exist when a juror is struck from the jury panel based on a reason equally applicable to an unchallenged juror); cf. Dorsey, 868 So.2d at 1201-02 (holding that a juror's nonverbal behavior, which is both disputed by the parties and not evident in the record because counsel failed to ask any questions concerning the behavior, cannot be a genuine race-neutral reason to sustain a peremptory challenge). In addition, the victim in this case was also in her mid-twenties, which further undermines the genuineness of the State's asserted justification  if Mr. Ortega was going to identify with someone in this case based solely on his age, he was just as likely to identify with the victim, which would clearly favor the State's position.
Thirdly, the prosecutor stated that he was worried about Mr. Ortega's ability to follow the law based on his wife's job at a daycare center and his philosophy on the death penalty. Certainly, a juror's inability to follow the law could be a viable concern for either a cause challenge or a peremptory strike. See Morrison v. State, 818 So.2d 432, 443-44 (Fla.2002) (stating that "unequivocal discomfort" with the death penalty is a valid race-neutral reason for a peremptory strike); Hartley v. State, 686 So.2d 1316, 1322 (Fla.1996) (same). However, when the prosecutor initially stated that he believed Mr. Ortega's philosophy on the death penalty would prevent him from following the law, the trial court immediately asked what answers given by Mr. Ortega would raise such a concern, and the prosecutor confirmed that "[t]here [were] no specific answers." In fact, the prosecutor first admitted that Mr. Ortega confirmed he would follow the law and then contended that a juror's inability to follow the law was really only relevant for a cause challenge. Thus, the prosecutor seemed to abandon Mr. Ortega's alleged inability to follow the law and ultimately rested his race-neutral reason on the fact that he just did not "particularly like" Mr. Ortega. Moreover, the record confirms that Mr. Ortega would fairly consider the imposition of the death penalty depending on the evidence he heard in the courtroom, could impose a death sentence in a murder case depending on the circumstances presented, only had "mixed feelings" about capital punishment, and never expressed uncertainty about his ability to vote for it in a proper case according to the appropriate *606 legal standards. In fact, he stated he would follow the law.[6]
Although the trial court revisited this issue the next morning and the prosecutor espoused yet another reason for the strike, namely, that Mr. Ortega felt he was judging the person, the defense attorney pointed out that these reasons were equally applicable to other jurors that were not challenged.[7] Further, the prosecutor only offered this "afterthought" justification after an entire day of reflection, which we have previously viewed with some skepticism. See Franqui v. State, 699 So.2d 1332, 1335 (Fla.1997) (affirming the trial court's decision to deny a peremptory challenge where the defense first stated that it did not "like" the juror and later attempted to justify the strike, after several pages of questioning, with additional reasons as an "afterthought"). Not only does the record contradict the State's belief that Mr. Ortega would not have an ability to follow the law, we simply cannot ignore that the prosecutor's initial response when asked for a race-neutral reason was essentially that he did not particularly like the juror.
Based upon the foregoing, we find that the trial court's decision to allow the peremptory challenge of Mr. Ortega was clearly erroneous because the State's explanations, which may have appeared to be race-neutral, were pretextual. The State's asserted reasons for the peremptory challenge were insufficient to satisfy equal protection because the challenge was unsupported by the record, directly contradicted by defense counsel, and based upon reasons that were not genuine. See Dorsey, 868 So.2d at 1202. We therefore find merit in Nowell's claim that the trial court erred in allowing the State's peremptory strike of Mr. Ortega because the State failed to provide a sufficient race-neutral reason for the strike.

State's Penalty Phase Closing Argument
Nowell also contends the trial court erred in denying his objections and motions for mistrial made during the State's penalty phase closing argument. The control of prosecutorial comments is within the trial court's discretion, and this Court will not reverse the trial court's decision unless there has been an abuse of that discretion. Schoenwetter v. State, 931 So.2d 857, 872 (Fla.), cert. denied, 549 U.S. 1035, 127 S.Ct. 587, 166 L.Ed.2d 437 (2006); Conde v. State, 860 So.2d 930, 950 (Fla.2003).
Nowell contends that the trial court erred in overruling the objections and motions for mistrial he made when the prosecutor made improper comments during the State's closing argument in the penalty phase of the trial.[8] At one point during the State's argument, the prosecutor said, "Mercy. State asks that you recommend mercy if mercy is warranted. And mercy *607 wasn't given in this case, not by Mr. Nowell, not by Mr. Bellamy. There was no mercy there, none whatsoever." Defense counsel objected and moved for a mistrial. The trial judge overruled the objection and denied the motion for mistrial. This comment is strikingly similar to a comment made by the prosecutor in Urbin v. State, 714 So.2d 411 (Fla.1998), a comment we found to be improper. In Urbin, the prosecutor argued:
If you are tempted to show this defendant mercy, if you are tempted to show him pity, I'm going to ask you to do this, to show him the same amount of mercy, the same amount of pity that he showed Jason Hicks on September 1, 1995, and that was none.
714 So.2d at 421. We held that this line of argument is blatantly impermissible under Rhodes v. State, 547 So.2d 1201, 1206 (Fla. 1989), and Richardson v. State, 604 So.2d 1107, 1109 (Fla.1992), which condemned these type of arguments because they are an unnecessary appeal to the sympathies of the jurors. The prosecutors statement is equally improper in this instance. Thus, the trial court erred in overruling defense counsels objection to this line of argument.

CONCLUSION
Based upon the foregoing, we reverse Nowell's conviction for first-degree murder and vacate his sentence of death. This case is remanded to the trial court with directions that a new trial be conducted.
It is so ordered.
QUINCE, C.J., and ANSTEAD, PARIENTE, and LEWIS, JJ., concur.
WELLS, J., dissents.
CANADY and POLSTON, JJ., did not participate.
NOTES
[1] Smith said he heard that Nowell and Bellamy had been shot earlier in the year on April 19, 2002. Smith testified that he did not know who had shot Nowell and Bellamy. During that shooting, Nowell was shot in the leg. Smith was one of the suspects in the shootings, but no arrests were ever made because the shooter was never identified.
[2] Because Smith had a tracheotomy, he used sign language to communicate.
[3] Spencer v. State, 615 So.2d 688 (Fla. 1993).
[4] The five claims raised are: (1) the trial court erred in allowing the State's peremptory strike of Nelson Ortega, a member of a minority group; (2) the trial court erred in denying Nowell's objections and motions for mistrial during the State's guilt phase closing argument; (3) the trial court erred in overruling Nowell's objections and motions for mistrial when the prosecutor made improper comments during his closing argument in the penalty phase of the trial; (4) the trial court erred in failing to find the death penalty unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); and (5) the trial court erred in finding as a statutory aggravator that Nowell committed the crime to avoid arrest.
[5] Although the State never asserted that Mr. Ortega was not of a protected class of jurors, we note that Florida courts have recognized Hispanic Americans as a cognizable ethnic group entitled to protection against discrimination in jury selection. See State v. Alen, 616 So.2d 452, 455 (Fla. 1993); Bernard v. State, 659 So.2d 1346, 1347 (Fla. 5th DCA 1995).
[6] Although the State relied upon his wife's job at a daycare center to support his inability to follow the law, we note that Mr. Ortega also had a sister-in-law who worked in law enforcement. In addition, Mr. Ortega worked in retail at a 7-Eleven and admitted that he had incidents of theft at his job. Importantly, as noted by defense counsel, these are two characteristics that the State would typically prefer in a juror, which further supports the pretextual nature of this challenge.
[7] In fact, in comparing Mr. Ortega's responses to questions about his feelings on the death penalty with those of Mr. Collins, the similarity is quite striking. Both potential jurors stated that they believed the death penalty should be reserved for the most serious crimes. However, as previously noted, the prosecutor in this case challenged Mr. Ortega but had no issue with Mr. Collins.
[8] Although the defendant argues that four comments were improper, we address only one of these comments in this opinion.